# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

_____

In Re:

THOMAS MECHAM RICKS,

**Debtor.**

**Bankruptcy Case
No. 09-00215-JDP**

_____

JEREMY J. GUGINO,
Chapter 7 Trustee,

**Plaintiff/Counterdefendant,**

**vs.**

KASTERA, LLC, an Idaho
Limited Liability Company,

**Defendant/Counterclaimant.**

**Adv. Proceeding No. 09-6067**

_____

# MEMORANDUM OF DECISION
_____

MEMORANDUM OF DECISION - 1

**Appearances:**

> Jeremy J. Gugino, Chapter 7 Trustee, Plaintiff, appearing *Pro Se*

> Thomas G.  Walker, COSHO HUMPHREY, Boise, Idaho, Attorney for Chapter 7 Debtor Thomas Mecham Ricks[1]

> Jed W. Manwaring, EVANS KEANE, Boise, Idaho and Thomas C. Morris, BELNAP LAW, Boise, Idaho, Attorneys for Defendant Kastera.

## I.

## Introduction

In this contest, two would-be real estate developers disagree concerning the terms and enforceability of their unsuccessful business agreements, and about the consequences that should flow from their alleged respective failures to perform their contractual obligations.

On January 29, 2009, Thomas Mecham Ricks ("Ricks") filed a chapter 11 petition to reorganize his real estate and agricultural

---

[1]  As discussed below, this adversary proceeding was initiated by Mr. Ricks in his capacity as a chapter 11 debtor-in-possession.  Mr. Gugino, the chapter 7 trustee, was substituted as the proper party-plaintiff following the conversion of the bankruptcy case to a case under chapter 7.

MEMORANDUM OF DECISION - 2

businesses.[2]  Kastera LLC ("Kastera") filed a creditor's proof of claim in

that bankruptcy case on May 27, 2009, contending in it that, as of the

petition date, Ricks owed Kastera $3,036,066[3] in damages for his breach of

their contracts.

On August 26, 2009, Ricks initiated this adversary proceeding

against Kastera.  In his complaint, Ricks alleged, among other things, that

it was Kastera that had breached the contracts with Ricks, and that Kastera

had defrauded him in their dealings.  *See* Docket No. 1.  For relief,  Ricks

objected to Kastera's proof of claim, contending that no debt to Kastera

was owed.  *Id.*  Moreover, Ricks sought an award of money damages

against Kastera.  *Id.*

Kastera filed an answer to the complaint, along with a counterclaim

against Ricks.  In its counterclaim, Kastera alleged that the parties'

---

[2]  Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. § 101 - 1532, and all rule references are to the Federal
Rules of Bankruptcy Procedure, Rules 1001 - 9037.

[3]  This amount consists of $2,231,250 in principal, $699,816 in interest, and
$105,000 in base draws, for a total of $3,036,066.  *See* Claim Register 18-1,
Bankruptcy Case No. 09-00215-JDP.

MEMORANDUM OF DECISION - 3

agreements were invalid and unenforceable, and that they should be

deemed to have been rescinded.  *See* Docket No. 6.  Alternatively, Kastera

alleged that it was actually Ricks who breached the agreements and

defrauded Kastera.  *Id*.  Kastera sought a return of the monies paid to

Ricks via validation of its proof of claim in the bankruptcy case.

While each party sought a summary judgment, on March 4, 2010,

the Court denied those motions, concluding that there were a variety of

disputed material fact issues that needed to be decided after trial.  *See*

Docket No. 41.  On April 8 and 9, 2010, the Court conducted the trial.[4]

The parties thereafter submitted their closing arguments via written briefs,

---

[4] While the parties called several witnesses at trial to testify, just prior to trial, on April 1, 2010, the parties stipulated to the admissibility of one another's documentary trial exhibits, subject to any objections based on relevancy or materiality.  Docket No. 46.  Then, only a few days later, Kastera filed a motion to exclude any expert testimony to be offered by Ricks' witness Gale Pooley regarding his alleged damages, as described in Ricks' proposed exhibits 146 and 147.  *See* Docket No. 50.  At the beginning of the trial the Court denied Kastera's motion, but indicated that it would take under advisement Kastera's objections to exhibits 146 and 147, and to any testimony by Mr. Pooley concerning damages, with those matters to be addressed in this decision on the merits.  *See* Trial Transcript, Day 1, 12:11-20.  Docket No. 54.  The Court admitted into evidence all of the parties' other exhibits per their stipulation, and deals with Kastera's objections to the Pooley testimony and exhibits below.

MEMORANDUM OF DECISION - 4

and the issues were taken under advisement by the Court.  *See* Docket Nos. 58 - 61.

Then, on June 18, 2010, on motion of Kastera, the Court entered an order converting Ricks' chapter 11 case to a case under chapter 7.  Because Ricks' claims against Kastera asserted in the adversary proceeding are property of the bankruptcy estate, and because a chapter 7 trustee, Jeremy Gugino, had been appointed to administer that estate, the Court convened a status conference on July 8, 2010 to discuss how this matter should proceed.  Gugino, and the attorneys for Ricks and Kastera participated in that conference.  *See* Minutes of Status Conference, Docket No. 64.  At that conference, all parties agreed that Gugino should be immediately substituted as the party-plaintiff in this action, something the Court accomplished via entry of an order that same day.  Docket No. 65.  In addition, Gugino asked that the Court proceed to decide the issues under advisement and issue a decision without further hearing or argument, a course of action also endorsed by Ricks and Kastera.

Having now carefully considered the evidence and testimony, the

MEMORANDUM OF DECISION - 5

parties' submissions, and the applicable law, the Court issues this

Memorandum of Decision which constitutes the Court's findings of fact

and conclusions of law.  Rule 7052.

## II.

## Findings of Fact[5]

### A.    The Spur Ranch Agreement.

It is not hyperbole to say that, in 2005, the residential real estate

market in Idaho's Treasure Valley was red hot.  In particular, lots suitable

for building homes in the area of Eagle, Idaho were in extremely high

demand, and in very short supply.

At that time, Kastera was a start-up home builder.  It was therefore

critical to its business plan that it acquire building lots near Eagle so it

---

[5] The findings of the Court set forth herein include both disputed and undisputed facts.  In resolving disputed issues of fact, the Court has carefully considered the testimony of the various witnesses, and based upon its opportunity to observe them testify, the Court has assessed their credibility. Since the testimony of the witnesses was in some instances inconsistent with other evidence presented, the Court's findings reflect its judgment concerning the relative weight assigned to that testimony.  Additional findings of fact are set forth later in this Memorandum in connection with the Court's discussion and dispositions of the issues in this action.

MEMORANDUM OF DECISION - 6

could construct and sell its homes.  Var Reeve ("Reeve") was the principal

of Kastera.  While he was enthusiastic and energetic, he was burdened by a

lack of prior experience in real estate development or construction.

Ricks was a long-time resident of the area, and had considerable

experience in acquiring and developing residential real estate.  While he

also had other projects underway and in planning, in December 2004,

Ricks had undertaken to develop and further subdivide approximately

15.75 acres of residential property in Eagle.  He referred to this project as

the Bellemead and Bellewood Village subdivisions, and he intended to

market the lots in the subdivisions as the first phase of a larger project he

called "Spur Ranch."[6]

In the spring of 2005, Ricks and Reeve were introduced to one

another by a mutual acquaintance, and began discussing potential joint

development projects, including the Spur Ranch development.  Ricks

---

[6] Phase I of Spur Ranch is legally described as Lots 1 and 2 in Block 1, and Lot 2 in Block 2 of Flint Estates Amended Plat, Book 45 of plats at pages 3713 and 3714.  These three parcels are located at 312 North Park Lane, 3850 West Flint Drive, and 3855 West Flint Drive, Eagle, Idaho.

MEMORANDUM OF DECISION - 7

considered Kastera to be an attractive potential buyer for the development

because the company apparently had access to capital to finance the

development of, and to then purchase, virtually all of the finished building

lots that Ricks could finish within Spur Ranch.  According to Ricks, this

was desirable since he needed money for his business ventures, and

because it relieved him of the need to deal with multiple buyers and real

estate agents in order to market the property.  The notion of a deal with

Ricks was also attractive to Kastera because it could provide Kastera with

a large number of building lots built out to its standards within a relatively

short time to meet growing demand for new homes in Eagle.  At bottom,

both Ricks and Kastera saw a business marriage as potentially profitable.

By June 2005, Ricks and Reeve had reached an informal, oral

understanding regarding the terms of Ricks' development, and Kastera's

purchase, of the building lots in Spur Ranch.  The parties agreed that

Kastera would fund Ricks' development of the lots to Kastera standards,

and then buy the lots in Spur Ranch for a per lot price.  To accomplish this

plan, Reeve, on behalf of Kastera, agreed to advance a portion of the final

MEMORANDUM OF DECISION - 8

purchase price for the lots to Ricks when Ricks obtained preliminary plat approval for the subdivision from the City of Eagle. The balance of the purchase price would be payable by Kastera to Ricks when the development was complete, the final plat had been approved, and Ricks could convey lots to Kastera so it could begin constructing houses on them. While this was to be a multi-million dollar venture, incredibly, no written agreement was prepared to evidence the parties' deal at that time.

On June 3, 2005, Ricks filed a Preliminary Plat Application with the City of Eagle.[7] Ex. 239. In the application Ricks proposed to subdivide the three parcels comprising Bellemeade / Bellewood Village into forty-eight (48) residential lots and fourteen (14) common area lots, for a total of sixty-two (62) lots, in what would be known as "Phase I" of Spur Ranch. *Id.* The project narrative, attached to the application, indicated that the land was owned[8] by Ricks, and that he was the developer.

---

[7] The application actually listed Ricks and John Wood as the applicants.

[8] Although the preliminary plat application only listed Ricks as the owner of the property, at that time, two other individuals held an interest in portions of the land. The land ownership is discussed in more detail below.

MEMORANDUM OF DECISION - 9

Ricks and Reeve were both present at a public meeting of the Eagle

City Council in September 2005 when the application was reviewed by the

council, and conditionally approved.  After the hearing, formal findings of

fact and conclusions of law were issued by the city to evidence its decision

to approve the preliminary plat on October 11, 2005.  They stated, in part,

that Ricks had been approved to develop forty-seven (47) residential lots

and sixteen (16) common lots,[9] and that the size of common area would be

3.00 acres, or 19.05% of the total project.  Exhibit 103.  As is frequently the

case, the City's approval of the plat was subject to a number of standard

and other "site-specific" conditions.  One condition required Ricks to

comply with the requirements of Drainage District #2 concerning the

property.  *Id.*  The findings and conclusions also required Ricks to provide

documentation from the Army Corp of Engineers ("Army Corp") to the

city engineer regarding whether the development would need a so-called

---

[9] The Court appreciates that the number of house lots approved by the
Eagle City Council varies slightly from the number contemplated in Ricks'
original application.

MEMORANDUM OF DECISION - 10

"404-permit"[10] in dealing with a drainage ditch on the property.  *Id.*

Kastera received a copy of the city's approval of Ricks' preliminary

proposal, its findings and conclusions, and Reeve and other Kastera agents

were aware of the limiting conditions for approval of the preliminary plat.

Although the City had approved the preliminary plat, Kastera did

not immediately advance any funds to Ricks as contemplated by the

parties' oral understanding.  Anxious to move forward with their deal and

project, Ricks prepared a short, six-paragraph, handwritten memorandum

which purported to memorialize the terms of the parties oral deal, or at

least his understanding of its terms.  Ex. 135.  Ricks' son, Thomas Aaron

Ricks ("Aaron")[11], typed the memorandum[12] and forwarded it to Thomas

---

[10]  This apparently was a reference to section 404 of the Clean Water Act,
33 U.S.C. § 1251, *et seq.*  That statute regulates the placement of dredged or fill
materials into waters of the United States, including areas deemed to be
wetlands.

[11]  No disrespect is intended by the Court's references to Ricks' son by his
middle name.  The parties have done so in this litigation, and the Court deems it
helpful to promote clarity in this decision.

[12]  In his deposition, a transcript of which was admitted in evidence as Ex.
141, Aaron explained that he typed the agreement exactly as his father had
written it in longhand.  *Id.* at 41:7.  However, in comparing these exhibits, the

MEMORANDUM OF DECISION - 11

Morris ("Morris"), Kastera's newly hired in-house general counsel. *See* Ex.

136. As might be expected, since the contract contemplated a deal

requiring Kastera to pay Ricks over $5 million, lawyer-Morris had several

concerns with Ricks' bare-bones draft of the agreement.

On November 30, 2005, Ricks, Aaron, Reeve, and Morris met at

Kastera's offices to discuss whether the parties intended to go forward

with the deal and the draft contract terms. At that meeting, among other

topics, the parties briefly discussed the estimated date that the completed

lots would be available to Kastera, the precise purchase price for the lots

and the amount Kastera would advance as an initial payment to Ricks, the

quality and extent of landscaping and other amenities to be included by

Ricks in the development, and the status of the title to the real property.[13]

---

Court noticed slight variations between the two documents. Despite these minor
inconsistencies, the fundamental terms of the agreement remained the same.

[13] The parties disagree about whether Ricks disclosed at this meeting that
he did not have clear title to the entire 15.75 acres, the rights of any third parties,
or the existence of certain encumbrances on the land in the form of deeds of trust
Ricks had granted to lenders as to some portions of the property. Ricks and
Aaron emphatically insist that the encumbrances were disclosed; Reeve and
Morris deny that the encumbrances were mentioned. At any rate, the deeds of
trust encumbering one of the five-acre parcels in Spur Ranch were, at that time, a

MEMORANDUM OF DECISION - 12

To alleviate Morris' concerns, and as a result of these discussions, Morris drafted a modified version of Ricks' original version of the agreement; even that draft was remarkably concise in its terms.

One of Morris' modifications to the contract draft involved insertion of a specific date by which Ricks would convey the finished, platted lots to Kastera, which was also the date on which Kastera was obligated to pay the balance of the contract price to Ricks.  Ricks' original draft merely indicated that the balance was due when Ricks provided Kastera with lots and Kastera could obtain building permits for those lots; it did not include a date certain.

Ricks understood that Kastera wanted the lots as soon as possible, but he was hesitant to commit to a specific deadline to deliver "saleable lots."  However, as a result of Morris' insistence that some sort of date was needed in the agreement, Ricks agreed to include the following language in the agreement:  "Kastera agrees to pay Ricks the remaining 62.5% of the gross sales price at the time Kastera can receive building permits for the

_____

matter of public record, having been recorded on May 11, 2005.  *See* Exs. 101, 102.

MEMORANDUM OF DECISION - 13

lots in phase one, *which Ricks estimates will be sometime in the spring of 2006.*"

Ex. 100 at ¶ 2 (emphasis added).

An additional paragraph relating to Ricks' ownership of the land comprising the development was also added to the modified draft.  This paragraph provided:

> Ricks represents and warrants to Kastera that he owns and possesses all right, title, and interest in and to the Spur Ranch property free and clear of all liens, claims, encumbrances, covenants, conditions, and restrictions that would prevent Ricks from developing the lots as contemplated hereunder and conveying them to Kastera in good and marketable condition.  At the time of closing, Ricks will convey to Kastera good and marketable title to the lots free of all liens, claims and encumbrances.  Ricks further represents that to the best of his knowledge, no hazardous materials have been transported to or from, or generated, placed, held, released, located, stored, or disposed of on, under, or at the Spur Ranch property.

Ex. 100, at ¶ 6.  Of course, as a matter of fact and public record, and notwithstanding this provision, at that time, Ricks did not own all of the property that comprised Phase I of Spur Ranch on November 30, 2005.  Ricks owned only the western four acres of the five-acre parcel located south of Flint Drive; Sylvia Jones owned the other one-acre portion on the

MEMORANDUM OF DECISION - 14

east side of that parcel.  In addition, Ricks held only an unexecuted option, not fee title, as to one of the five-acre parcels on the north side of Flint Drive; that property was owned by the Woods.[14]  And, as noted above, the other five-acre parcel was, at that time, subject to a lender's deed of trust to secure the unpaid balance on a loan made by the lender to Ricks.  On the other hand, Ricks was confident that, by the time he was required to hand over the finished lots to Kastera, he would have acquired and held clear title to the property.

With these changes, the revised version of the memorandum of their agreement (the "Spur Ranch Agreement") was signed on November 30, 2005 by Ricks and Reeve.[15]  It provided its terms were retroactively effective on June 1, 2005.  Ex. 100.

The Spur Ranch Agreement described the property subject to the

---

[14]  On December 3, 2005, shortly after the Kastera agreement was signed, Ricks met with Robert and Jason Wood and negotiated the closing on this preexisting option.  As part of that deal, Ricks agreed to reserve two undefined building lots in Spur Ranch within that five-acre parcel for Robert Wood as a partial payment for transfer of title to the acreage.

[15]  Reeve signed in his capacity as President of Kastera.

MEMORANDUM OF DECISION - 15

contract as "all the lots in the first phase of Spur Ranch (recorded name of

Bellemeade Subdivision in Eagle, Idaho, legal description attached hereto

as Exhibit A)" consisting of "14 lots south of Flint Drive and 30 lots north

of Flint Drive." *Id.*  At the time the contract was signed by the parties,

there was no legal description attached to the document.  Morris testified

that he later attached a legal description,[16] but that he could not recall its

source.  However, the most likely source for this description was a title

report that Kastera obtained for the property shortly after the Spur Ranch

Agreement was signed.  Ricks testified that the legal description that was

ultimately attached to the Spur Ranch Agreement was indeed the correct

legal description for the project.

The day after the Spur Ranch Agreement was signed, Kastera wire-

transferred $2,231,250 to Ricks' bank account.  According to the contract,

this amount represented 37.5% of the total amount Kastera had agreed to

pay to Ricks to develop and convey to Kastera 44 lots in Phase I of the

---

[16]  The attached legal description referred to the property as:  "Lots 1 and 2, Block 1, and Lot 2, Block 2, of Flint Estates Amended Plat, Book 45 of plats at pages 3713 and 3714."  Ex. 100.

MEMORANDUM OF DECISION - 16

Spur Ranch development.  The amount payable from Kastera to Ricks was calculated as follows:  for the fourteen (14) lots on the south side of Flint Drive, Kastera would pay Ricks $125,000 per lot; and for the thirty (30) lots on the north side of Flint Drive, Kastera would pay Ricks $140,000 per lot (*i.e.,* $125,000 x 14 = $1,750,000 and $140,000 x 30 = $4,200,000).

After the Spur Ranch Agreement was signed, Ricks continued his efforts to satisfy the conditions in the preliminary plat, so that he could obtain approval of a final plat from the City of Eagle, and begin construction of the extensive development improvements.  In particular, the preliminary plat called for a drainage ditch which was located on the property to be filled.  However, at that time, the Army Corp had not yet determined whether it would assert jurisdiction over the drainage ditch, thereby requiring Ricks to obtain a 404-permit for the work.  Over the next several months, Ricks, along with the engineering firms he employed, worked with the Army Corp to resolve the issues surrounding the drainage ditch and to obtain the necessary permits and licenses.  During this time Ricks and Aaron met with Reeve and other Kastera

MEMORANDUM OF DECISION - 17

representatives on a periodic basis to report their progress.  It was not

until January 30, 2007, that Ricks finally learned that the Army Corp

would indeed assert jurisdiction over the drainage ditch.  *See* Ex. 110.

However, on March 23, 2007, he was informed that, in the opinion of the

Army Corp, the development project fell under a particular irrigation

exemption, and that a 404-permit would not be required to complete his

work on the drainage ditch.  *See* Ex. 113.  Shortly thereafter Ricks was also

able to secure the approval and appropriate licenses from Drainage

District #2 to pipe the drainage ditch, and move forward with the

development.

During the spring and summer of 2007, communication between

Ricks and Reeve became strained and sporadic.  Reeve and Kastera had

become frustrated with Ricks' lack of progress on Spur Ranch.  Moreover,

the residential real estate market was beginning to soften significantly.

Reeve was worried about the level of Ricks' commitment and effort to

complete Spur Ranch.  In addition, at that time, Kastera was involved in

restructuring into two entities, with one involved in home construction,

MEMORANDUM OF DECISION - 18

and a new entity handling real estate development. Although Ricks and Reeve regularly encountered one another at church, Ricks testified that it was his practice not to discuss business there. Instead, during this time, Ricks sent several letters to Reeve requesting information that he needed to satisfy various conditions for final plat approval, and seeking guidance on which Kastera entity or personnel he needed to be dealing with concerning Spur Ranch. *See* Ex. 115, 116.

Also during this time, Ricks was endeavoring to secure financing in order to complete the actual construction of the improvements in Phase I of Spur Ranch. In May of 2007, Ricks received tentative approval for a construction loan from Washington Trust Bank. However, shortly thereafter, the bank's proposal was withdrawn. Ricks testified that he understood that the reason for the withdrawal was that Dean Oberst, one of the bank's managers, had learned that Kastera did not intend to complete the contract to acquire the lots in Phase I of Spur Ranch.

Later, Ricks was able to obtain a conditional construction loan commitment from D.L. Evans Bank. However, for final approval, Ricks

MEMORANDUM OF DECISION - 19

testified that the bank required him to obtain some evidence from Kastera

to assure the bank that Kastera would indeed close the Spur Ranch

Agreement upon completion of the development.  In a letter dated March

28, 2008, the bank summarized its position:

> We advised you that in order for D.L. Evans Bank to consider
> a development loan we would need a guarantee that the
> subdivisions sales agreement [the Spur Ranch Agreement]
> would close upon completion.
>
> We were and remain unable to offer an approval for
> development financing without a guarantee in the form of a
> Letter of Credit.  If Kastera were able to produce a Letter of
> Credit from an acceptable Bank, insuring their performance to
> pay off the development loan, we would reconsider your
> request.

Ex. 119.

Kastera balked at the idea of obtaining a letter of credit to secure its

obligation under the Spur Ranch Agreement.  This proposal also bothered

greatly both Reeve and Morris, since it was their impression that Ricks had

committed to use the money advanced by Kastera for construction on Spur

Ranch, and now, Ricks was indicating those funds had been spent, and a

large bank loan was needed to complete the work.  In the end, without

MEMORANDUM OF DECISION - 20

Kastera's cooperation, Ricks was unable to obtain the financing he needed to complete construction of the lots in the Spur Ranch development.[17]

Things between the parties came to a head in the fall of 2007. At that time, Kastera hired legal counsel, who sent a letter to Ricks dated October 12, 2007, accusing him of failing to perform the parties' agreement, and demanding "a full and complete rescission of [Kastera's] agreement with Tom Ricks and a complete return of the $2,231,250 paid to him." Ex. 120. Ricks refused this demand. He felt he had done nothing wrong, and he expected Kastera to honor its commitment to pay him to acquire the Spur Ranch lots. A stalemate ensued.

Thereafter, the Eagle City Council completed its review of Phase I of the Spur Ranch project and approved a final plat; its findings of fact and conclusions of law confirming this were issued on December 5, 2007. Ex. 117. However, owing to his lack of financing, Ricks was, and still remains, unable to complete the improvements for the development, so the final

---

[17] Ricks also explored the possibility of obtaining a construction loan from Idaho Banking Company, though it appears his proposal was denied.

MEMORANDUM OF DECISION - 21

plat has never been recorded.  On December 16, 2009, the Eagle City

Council approved an extension for the final plat until November 20, 2010.

Ex. 124.

       **B.**     **The Other Properties Agreement.**

In addition to their deal involving Spur Ranch, Ricks and

Reeve/Kastera contemplated additional business relationships and

transactions in 2005.  As noted previously, at that time Kastera was

seeking to acquire as much property as possible in the Eagle area upon

which it could build houses.  Ricks, as a long-time resident of Eagle, had

developed personal relationships with several landowners in the area.  As

a product of Kastera's need for property, and Ricks' potential access to

sellers, the parties reached another oral understanding.

According to this deal, Ricks agreed to work to persuade land

owners to sell their undeveloped property to Kastera.  When Kastera

acquired the properties under deals brokered by Ricks, Kastera agreed

Ricks would then develop the property for Kastera, with Kastera fronting

the development costs.  As consideration for these services, Kastera agreed

MEMORANDUM OF DECISION - 22

to pay Ricks a percentage of the net profit for each finished lot sale.[18]

Like the Spur Ranch Agreement, this oral understanding was later reduced to writing in a series of written contracts,[19] each signed by Ricks and Reeve.[20] These documents evidence what was collectively referred to by the parties as the "Other Properties Agreement." Though dated otherwise, the Other Properties Agreement and the addenda, were all prepared and signed by the parties at about the same time the Spur Ranch Agreement was signed, on November 30, 2005.

One of the writings in the Other Properties Agreement consisted of a single paragraph in which the parties identified three separate properties

---

[18] In addition, Kastera agreed to pay both Ricks and Aaron monthly draws and provide them with other benefits, with the amount of such draws to be credited against any final payment under the agreement.

[19] Three separate writings together memorialized the parties' "Other Properties Agreement":  the "Agreement, dated June 15, 2005";  the "Addendum to Agreement dated June 15, 2005";  and the "2nd Addendum to Agreement dated June 15, 2005."  Exs. 129, 130, 131.

[20] In contrast to the Spur Ranch Agreement, where Reeve signed the agreement in his capacity as President of Kastera, it appears that these documents were signed by Reeve in an individual capacity; there are no notations on the signature lines of these documents indicating that Reeve was signing on behalf of Kastera.  *See* Exs. 129 - 131.

MEMORANDUM OF DECISION - 23

which were subject to the agreement.  Those were:  "The Thornton

Property located at the Southeast corner of Floating Feather and Highway

16, Eagle, Idaho.  The Purdy Property at the Northwest corner of Floating

Feather and Lanewood, Eagle, Idaho.  The Gabica Property North of the

Purdy Property on Beacon Light Road, Eagle, Idaho."  Ex. 130.  Another

writing identified an additional property known as the Cleaver Property

or Pristine Meadows on North Star Road in Star, Idaho.  Ex. 131.  In

addition, this document adjusted downward the percentages of profit

distributable to Ricks for some of the properties subject to the agreement.

*Id.*

  As contemplated by the Other Properties Agreement, Ricks began

connecting Kastera with potential sellers, and Kastera began making deals

to acquire their various properties.  However, in contrast to the parties'

agreement regarding development, Kastera denied Ricks' the right to plan

and develop these properties.  Instead, under the supervision of Wayne

Forrey, an in-house member of Kastera's staff, Kastera took over the

development of the properties.

MEMORANDUM OF DECISION - 24

### C.    The Breakup.

In 2005, in the midst of a booming Treasure Valley home sales market, the Ricks/Kastera ventures surely must have seemed to be good business for all concerned.  Communities were eager to see new subdivisions built.  Ricks was an experienced developer, already in the process of completing Spur Ranch, a top-notch new neighborhood, and he knew other landowners who may have be willing to cash in on the rising market.  And Kastera, which at the time had access to capital, needed lots on which to build, and then sell, houses.  The constant appreciation in house sale prices was such that, under the circumstances, time was of the essence, and to the parties, a handshake and verbal understanding certainly seemed adequate at the time to accommodate any risk, even though a multi-million dollar venture was contemplated.  What was most important to the parties was not detailed, written contracts, but instead, "getting the deal done."

Then came 2007, and the real estate market began to sour.  After two years of delay and frustrating work to get necessary approvals for a final

MEMORANDUM OF DECISION - 25

plat of the Spur Ranch development, the Ricks/Kastera undertaking no longer seemed very attractive to Kastera. Frustrated, and undergoing its own painful restructuring, Reeve and Kastera decided to terminate the parties' contract. Kastera's motivation was understandable enough. Having expended over $2.23 million, and with virtually nothing but Ricks' promise to show for it, it wanted to put an end to the parties' relationship and salvage what value it could.

This bankruptcy case, and in particular, this adversary proceeding, addresses the legal and financial consequences of Kastera's decision. Kastera wants its money returned by Ricks. Ricks, on the other had, was likely bankrupted by the unsuccessful venture and wants Kastera to pay him damages for its breach of the parties' agreements.

### III.

### Conclusions of Law, Discussion, and Disposition of the Issues

### A.    Validity of the Spur Ranch Agreement.

Kastera's defense to Ricks' damage claim, and its own claim against Ricks for a refund of the monies it paid him, are based upon its contention

MEMORANDUM OF DECISION - 26

that the underlying Spur Ranch Agreement was invalid and legally

unenforceable for a variety of reasons.

First, Kastera argues that the parties' verbal agreement, which was

later reduced to writing and signed by both parties, contains an inadequate

description of the real property to which it relates, and thereby fails to

satisfy Idaho's statute of frauds.  Next, Kastera asserts that the agreement is

void because it violates both an Idaho statute and the City of Eagle's plat

approval ordinance.

Ricks, on the other hand, argues that the description of the property

is adequate and that the Spur Ranch Agreement satisfies the statute of

frauds and is therefore valid and enforceable.  In addition, Ricks contends

that any apparent failure to comply with the Eagle City ordinance or the

Idaho Code does not necessarily invalidate the agreement.  The Court will

address each argument in turn.

    1. <u>The statute of frauds</u>.

The Idaho statue of frauds provides that agreements for the sale of

real property are invalid unless the agreement, or some note or

MEMORANDUM OF DECISION - 27

memorandum thereof, is in writing and signed by the party to be charged

or his agent.  Idaho Code § 9-505(4); *Ray v. Frasure*, 200 P.3d 1174, 1177

(Idaho 2009).  The Idaho Supreme Court has consistently held that contracts

for the sale of real property that fail to comply with the statute of frauds are

unenforceable, and cannot be remedied by specific performance nor serve

as the basis for an award of damages.  *Frasure*, 200 P.3d at 1177; *Hoffman v.

S V Co.*, 628 P.2d 218, 221 (Idaho 1981).  For such contracts to satisfy the

statute of frauds, not only must an agreement for the sale of real property

be in writing and subscribed by the party to be charged, but the writing

must also contain an adequate description of the property, either in terms

or by reference, so that the property can be identified without resort to

parol evidence.  *Garner v. Bartschi*, 80 P.3d 1031, 1036 (Idaho 2003).

Kastera notes that, in recent years, the Idaho Supreme Court has

clarified the standard against which the legal adequacy of property

descriptions in real estate contracts are measured.  Kastera points first to

*Lexington Heights Dev., LLC v. Crandlemire*, 92 P.3d 526 (Idaho 2004), in

which the Idaho Supreme Court invalidated a contract for the sale of land

MEMORANDUM OF DECISION - 28

which failed to precisely describe the boundaries of a five-acre parcel which

the parties intended to reserve from the sale of a larger 95-acre parcel.  No

doubt, the Court should consider this decision in resolving the issues

presented here.

In *Lexington Heights*, the Crandlemires contracted to sell

approximately 90 acres out of a 95-acre parcel of real property they owned

to Lexington Heights Development, LLC.  The contract described the

property being sold as "the real property situated in Ada County, Idaho

located at 1400 West Floating Feather Road, consisting of approximately

ninety (90) acres . . ., however excluding the residential dwelling (which

will include no more than five acres) and improvements identified below

(herein called 'Premises')."  *Lexington Heights*, 92 P.3d at 528.  In addition to

the house and the improvements, the Crandlemires also intended to

reserve an additional small tract of land which they could then convey to

United Water Corporation, which planned to construct a water tower on

the site.  The contract further provided that the precise size, location,

dimensions, and configuration of the excluded five-acre parcel would be

MEMORANDUM OF DECISION - 29

"mutually determined by Seller and Buyer" through a future survey of the

property. *Id.*

    After this contract was executed, the property was indeed surveyed

and three legal descriptions were prepared:  one for the entire property,

one for the 4.54 acres which was to be retained by the Crandlemires, and

one for the 0.46 acres which the Crandlemires intended to convey to United

Water Corporation.  After the survey was completed, the parties executed a

second real estate contract, which expressly provided that it superseded all

prior agreements between the parties.  Even though precise legal

descriptions had been prepared for the entire property and the parcels to be

excluded from the sale, this new agreement did not include nor even  refer

to those legal descriptions to describe the property to be sold.  Rather, the

new agreement incorporated the imprecise property description from the

first contract.

    Eventually, the Crandlemires refused to close the sale to Lexington

Heights and ultimately sold forty acres of the property to a third party.

Lexington Heights sued the Crandlemires, seeking damages for breach of

MEMORANDUM OF DECISION - 30

their agreement and specific performance as a remedy.  The district court

determined that the agreement was unenforceable because it did not

contain a sufficient legal description of the property being sold, and

Lexington Heights appealed.  The Idaho Supreme Court agreed with the

district court, noting that "[t]he legal description in the Agreement does not

contain a sufficient description of the property to be sold because it does

not contain any description sufficient to identify the approximate five-acre

parcel that is to be excluded from the sale."  *Id*. at 532.  The Supreme Court

further explained that "the issue with respect to the statute of frauds is not

whether the parties had agreed upon the precise dimensions of the

property to be sold.  It is whether the written memorandum contains an

adequate description of the property to be sold."  *Id.* at 533.

Kastera also relies on *Frasure, supra,* where the Idaho Supreme Court

held that a property description in a real estate contract that consisted

solely of a physical address did not satisfy the statute of frauds.  200 P.3d at

1177.  In *Frasure*, the parties contracted for the sale of real property owned

by Don Frasure which they described in their written contract as "2275 W.

MEMORANDUM OF DECISION - 31

Hubbard Rd., City of Kuna, County of Ada, Idaho 83634." *Id.* at 1175.

Although the contract included a space for a legal description of the

property, it was left blank. A box which the parties could have used to

indicate that a legal description was attached as an addendum was also left

unchecked, and no legal description was attached to the contract. The

buyer was not able to close on the contract, and requested a few extra days

to perform. Shortly thereafter, the buyer deposited all funds due under the

contract with the escrow company. However, the real estate agent

representing Frasure informed the buyer that he did not intend to perform

under the contract and had relisted the property for sale. Frasure

eventually accepted an offer to sell the property to a different party for a

significantly higher price. The original buyer sued to have its contract

specifically performed. The district court found that Frasure had breached

his contractual duties to the original buyer and ordered specific

performance of the contract.

On Frasure's appeal, the Idaho Supreme Court explained that a

"description of real property must adequately describe the property so that

MEMORANDUM OF DECISION - 32

it is possible for someone to identify 'exactly' what property the seller is

conveying to the buyer." *Frasure*, 200 P.3d at 1178, (citing *Garner*, 80 P.3d at

1036). Quoting from an earlier decision, the court also noted that "[a]

description contained in a deed will be sufficient so long as quantity,

identity or boundaries of property can be determined from the face of the

instrument, or by reference to extrinsic evidence to which it refers." *Id*.

(quoting *City of Kellogg v. Mission Mountain Interests Ltd., Co.*, 16 P.3d 915,

920 (Idaho 2000)). The court then held that, standing alone, a physical

address is not a sufficient description of property for purposes of the

statute of frauds, as it gives no indication of the quantity, identity, or

boundaries of the real property to be sold. *Id.* at 1179.

Although *Lexington Heights* and *Frasure* inform the Court's analysis in

this action, neither case is precisely on point and both can be distinguished.

One significant distinction between those two cases and this one is the fact

that both of the Idaho cases dealt solely with a contract for the sale of real

property. However, under the Spur Ranch Agreement, the purchase and

sale of building lots from Ricks to Kastera is but one component of a larger

MEMORANDUM OF DECISION - 33

real estate development venture contemplated by the parties.

At the time the Spur Ranch Agreement was orally made, and then executed in writing, Kastera was a relatively new business, and not heavily engaged in developing real property; it's primary business was *constructing* and selling houses.  In other words, at that time, raw land that had not been platted and developed into buildings sites would have been of little use to Kastera.  Had it acquired the unplatted Spur Ranch property, it would have had to either hire someone to develop it into buildable lots, or have attempted to undertake that complex task on its own.  Based upon the evidence, neither prospect seemed very realistic at the time.

Without doubt, Kastera needed not only the land, but also Ricks' development skills and experience to transform the bare ground into completed lots so that Kastera could do what it did best – build and sell houses.  Put another way, while the Spur Ranch Agreement obviously provided for the purchase and sale of real estate, it also contained the parties' agreement that Ricks would employ his considerable skills to develop the property into buildable lots, ready for Kastera's use.  In this

MEMORANDUM OF DECISION - 34

sense, the Spur Ranch Agreement is a sort of hybrid – a combination of both the purchase/sale of land, and a personal services contract requiring Ricks to complete the development, in many respects, to Kastera's standards. Because only one aspect of the contract deals with the sale of real estate, the Court is confident that, under these facts, the Idaho Supreme Court would not hold the Spur Ranch Agreement completely unenforceable, and thereby deprive Ricks of the value of the services he was to provide in developing the subdivision.

In terms of judging the adequacy of a contract's description of property to be sold, then, it appears clear enough from *Frasure* that a property description consisting solely of a physical address will fail to satisfy the statue of frauds. The reason for the court's holding is apparent: although the general location of the subject property in that contract may be ascertained, the precise quantity of land, and the specific boundaries of the parcel intended for sale, are not readily determinable.

But defects like those in the *Frasure* contract are not present in the Spur Ranch Agreement. Not only can the general location of the subject

MEMORANDUM OF DECISION - 35

property be ascertained from the face of the Spur Ranch Agreement, the precise quantity of building lots and the exact outer boundaries of the project are clear from the legal description attached to the contract. Put another way, in their contract, Ricks and Kastera did not stop at inclusion of a physical address for the property, as did the parties in *Frasure*; rather, they provided the existing legal description of the entire property, and identified a specific amount of completed lots that were to be developed and sold by Ricks to Kastera within each portion of that parcel. In this fashion, the Court concludes the parties have described the location, quantity, and boundaries of the property to be sold. *See Frasure*, 200 P.3d at 1178 ("A description contained in a deed will be sufficient so long as quantity, identity or boundaries of property can be determined by the face of the instrument[.]"). Indeed, since the Spur Ranch property had not yet been finally platted, they had no choice but to rely upon a legal description of the whole property supplemented by other informal identifying information. In the Court's view, under the circumstances, neither Ricks nor Kastera could have been more precise in describing the subject

MEMORANDUM OF DECISION - 36

property, given the legal description of the property that was available to them at the time.

The same could not have been said of the parties in *Lexington Heights*. In that case, the buyer and seller contemplated further negotiations over the specific boundaries of the five-acre parcel of land which was to be excluded from the sale – leaving the description of the property that was to be sold somewhat in question.  Although that small parcel had been surveyed, and a separate legal description had been prepared, the buyer and seller in *Lexington Heights* chose not to utilize that legal description in describing the property to be sold.  By contrast, in this case, at the time Kastera executed the Spur Ranch Agreement, no further negotiations over specific lots nor additional surveys of the property were immediately contemplated. Indeed, based upon the testimony of Reeve regarding Kastera's approach to acquiring land, and the other testimony and evidence, the Court finds that Reeve did not even care which of the 44 lots in the finished subdivision

MEMORANDUM OF DECISION - 37

Kastera ultimately received.[21]  To Reeve and Kastera, provided they met

Kastera's guidelines, lots were lots – a fungible commodity that merely

represented an available location upon which it could build and then sell a

house.  In short, Kastera merely wanted any 44 of the finished lots in Phase

I of Spur Ranch, and it wanted them as soon as possible.  Under these

circumstances, Ricks and Kastera described the property as accurately as

possible, given the information available to them at the time.[22]

     The Court concludes, under these facts, that the Spur Ranch

Agreement contains a sufficient description of the property to be sold to

Kastera to satisfy the Idaho statute of frauds.

───────────────────

     [21]  The only condition placed by the parties on which lots Kastera was to
receive was specified in their written contract:  fourteen of the lots were to be on
one side of Flint Drive, and thirty were to be on the other side.

     [22]  Of course, at the time the parties signed the Spur Ranch Agreement, the
preliminary plat showing the approximate lot locations had been approved by
the City of Eagle.  It laid out the location of the building lots (47 in all) and of the
commons areas.  Having contracted to receive 44 of the lots, 30 and 14 on each
side of Flint Drive, Kastera certainly had a reasonably precise understanding of
what it was buying.  Since the lots could not be described as such until the final
plat was approved after the development was complete, Kastera had as much
information as it could reasonably expect about the location of the lots covered
by the Spur Ranch Agreement.

MEMORANDUM OF DECISION - 38

2.    The Idaho Code and the Eagle City ordinance.

Kastera next relies upon Idaho Code § 50-1316 and an Eagle City

ordinance to argue that the Spur Ranch Agreement can not be enforced.

The city ordinance simply provides that "[n]o lots shall be sold until the

plat has been recorded in the office of the county recorder." Eagle City

Code § 9-2-7. The City Code also provides that violations of this ordinance

constitute misdemeanors, and are punishable by fine or imprisonment, or

both. *See* Eagle City Code § 9-6-5, and § 1-4-1. Likewise, the Idaho statute

also provides for a fine for selling or offering for sale lots in a subdivision

prior to the final plat being recorded. Idaho Code § 50-1316 (providing that

"[a]ny person who shall dispose of or offer for sale any lots in any city or

county until the plat thereof has been duly acknowledged and recorded . . .

shall forfeit and pay one hundred dollars ($100) for each lot and part of a

lot sold or disposed of or offered for sale."). Kastera argues that because

Ricks' attempted sale of unplatted lots in the Spur Ranch Agreement is

expressly prohibited by statute, the contract is void. The Court respectfully

disagrees.

MEMORANDUM OF DECISION - 39

In *Cox v. Mountain Vistas, Inc.*, 639 P.2d 12 (Idaho 1981), the Idaho

Supreme Court addressed this very issue.  In that case, the court noted that

"where certain acts or omissions are expressly proscribed by statute,

contracts based on such acts or omissions are void."  *Id*. at 19 (citing *inter*

*alia, Wheaton v. Ramsey*, 436 P.2d 248 (Idaho 1969); *Whitney v. Continental Life*

*& Accident Co.*, 403 P.2d 573 (Idaho 1965); *Messerli v. Monarch Memory*

*Gardens, Inc.*, 397 P.2d 34 (Idaho 1964)).  However, the court also explained

that it normally refuses to "extend the terms of a statute to void a contract

unless such a result was within the intent of the legislative body."  *Id.*

(citing *Gallafent v. Tucker*, 281 P. 375 (Idaho 1929)).  After analyzing several

more recent cases in other states, the court explained that "[t]he language of

[Idaho Code § 50-1316] does not prohibit the act, i.e., the sale of lots of an

unrecorded plat, nor does the provision mandate that the vendor must

record the plat prior to contracting for the sale of the realty."  *Id.* at 20.

Accordingly, the court held that the legislature had dealt with this subject

completely and did not intend to invalidate real estate contracts where the

seller failed to record the plat prior to offering a lot for sale.  *Id.*  Based upon

MEMORANDUM OF DECISION - 40

this decision, the Court has no doubt that the Idaho courts would also not

allow Kastera to rely upon a similar city ordinance to prevent enforcement

of its contract with Ricks.  Thus, under *Cox*, the Court concludes that the

Spur Ranch Agreement is not void merely because the final plat to Spur

Ranch was not recorded at the time the Spur Ranch Agreement was

executed.

**B.    Was the Spur Ranch Agreement Breached?**

Having concluded that the Spur Ranch Agreement is not rendered

unenforceable under the Idaho statute of frauds, or void for failure to

comply with Idaho Code § 50-1316 and Eagle City Code § 9-2-7, the Court

must next consider whether the Spur Ranch Agreement was breached, and

if so, by which of the parties.

1.    Kastera's arguments regarding breach.

Kastera argues that Ricks breached the Spur Ranch Agreement in at

least two ways.  First, it contends that Ricks breached the Spur Ranch

Agreement by failing to timely deliver the completed lots by June 2006, or

within any reasonable time thereafter.  Kastera also argues that Ricks

MEMORANDUM OF DECISION - 41

breached the warranty to convey the lots to Kastera free of any liens or

encumbrances.  As explained below, both of these arguments lack merit.

When Ricks and Reeve initiated their arrangement in the spring of

2005, both parties anticipated that Phase I of Spur Ranch could be

completed relatively quickly.  Ricks certainly understood that Kastera was

anxious to obtain lots suitable for construction as soon as possible to take

advantage of the then-booming housing market.  As an experienced

developer familiar with the market, Ricks understood the importance of

timing in this context.  However, that same experience had taught Ricks

that occasionally, if not often, unforseen circumstances and setbacks can

delay development projects.  With that in mind, Ricks credibly testified

that, as things stood in 2005, he was reluctant to fix a date certain in his

arrangement with Kastera by which he would be required to deliver

completed lots to Kastera.  However, he remained hopeful, indeed

optimistic, that he could do so quickly.[23]  Reflecting this concern, Ricks'

---

[23]  Indeed, Ricks also had a financial incentive to complete the project
timely, as the $3,718,750 balance due to him under the contract was payable to
him only upon delivery of the finished lots to Kastera.

MEMORANDUM OF DECISION - 42

original handwritten draft of the parties' agreement made no mention of a

specific closing date.  *See* Ex. 135.

When the parties met in November of 2005 to finalize the deal, the

Eagle City Council had already conditionally approved the Spur Ranch

preliminary plat.  Given the information included in the City's findings of

fact and conclusions of law, both parties were aware that, before the final

plat would be approved, issues regarding the drainage ditch needed to be

addressed to the potential satisfaction of both the Army Corp and Drainage

District #2.  And Reeve and Kastera were aware that Ricks had been

working on those issues, but that a final resolution had not been reached.

Nonetheless, Kastera, through Morris, insisted that a closing date must be

included in the contract.  Ultimately, Ricks consented to language which

Morris drafted:

> Kastera agrees to pay Ricks the remaining 62.5% of the gross
> sales price at the time Kastera can receive building permits for
> the lots in phase one, *which Ricks estimates will be sometime in the
> spring of 2006*.

Ex. 100 (emphasis added).

MEMORANDUM OF DECISION - 43

If by this language Kastera intended to hold Ricks to a firm closing date, Morris' attempt to do so was ineffective.  At the trial, Ricks testified that he did not consider this additional language to represent a binding commitment to deliver lots to Kastera by the following spring.  Instead, he viewed this term more as an aspirational goal which he sincerely hoped to achieve.  Given the information he had at the time, it is not surprising Ricks believed that he would be able to produce completed lots to Kastera by that time.  However, as the circumstances evolved, Ricks could not complete a resolution of the drainage ditch issues by the end of spring 2006, and consequently could not finish the development improvements and deliver completed lots to Kastera at that time.

This delay was surely bad news to Kastera.  Even so, over the next several months, Kastera did not declare Ricks in default.  Instead, in frequent meetings,  Reeve and others at Kastera merely encouraged Ricks to work hard to get the drainage issues promptly resolved, the plat finalized, and the subdivision improvements finished.

From the Court's perspective, the facts show that the parties

MEMORANDUM OF DECISION - 44

deliberately employed the rather vague language of the Spur Ranch

Agreement regarding a date for delivery of the finished lots to Kastera, and

that they intended only that the completion date in the contract serve as a

goal, representing their joint hopes that the project would be completed in

the near future.  Clearly, the contract did not command Ricks to deliver

completed lots before the first day of summer in 2006, as Kastera now

suggests in its briefs.  Kastera, whose legal counsel drafted the revisions to

the Spur Ranch Agreement now in play, could have easily spelled out that

time was of the essence with respect to finishing this project, and could

have included a firm deadline for Ricks to complete performance.  The

language Morris drafted did no such thing.  Moreover, Kastera's actions

after June 2006 suggested it did not intend that Ricks' inability to deliver

lots as "estimated" in the Spring of 2006 would be a deal-breaker.  The

uncontroverted testimony at trial was that after this date, Kastera

repeatedly encouraged Ricks to continue working with the Army Corp and

others to resolve all issues necessary to obtain the final plat and finish

developing the lots.  This encouragement continued throughout the

MEMORANDUM OF DECISION - 45

remainder of 2006 and through the summer of 2007.  Given these facts, the

Court concludes that Ricks did not breach the agreement by failing to

deliver completed lots to Kastera by the end of spring 2006.

The argument that Ricks breached the Spur Ranch Agreement by

failing to deliver unencumbered title to the property to Kastera also fails.

As previously discussed, another one of the provisions that Kastera's

attorney added to the Spur Ranch Agreement prior to its signing pertained

to the quality of Ricks' title to the Spur Ranch property.  It states:

> Ricks represents and warrants to Kastera that he owns and
> possesses all right, title, and interest in and to the Spur Ranch
> property free and clear of all liens, claims, encumbrances,
> covenants, conditions, and restrictions that would prevent
> Ricks from developing the lots as contemplated hereunder and
> conveying them to Kastera in good and marketable condition.
> At the time of closing, Ricks will convey to Kastera good and
> marketable title to the lots free of all liens, claims and
> encumbrances.  Ricks further represents that to the best of his
> knowledge, no hazardous materials have been transported to
> or from, or generated, placed, held, released located, stored, or
> disposed of on, under, or at the Spur Ranch property.

Ex. 100, at ¶ 6.

At trial, Morris explained his reasoning as to why this particular

MEMORANDUM OF DECISION - 46

paragraph was added to the contract.  Although he conceded that the

provisions of this paragraph (like others) may have been inartfully drafted,

Morris indicated that its purpose was two-fold.  First, Morris indicated this

provision was intended to require that Ricks warrant that all of the real

property in the subdivision covered by the agreement was currently owned

by Ricks free and clear of all liens or encumbrances.  And secondly, Morris

says, this provision was intended as an additional warranty by Ricks that

the property would remain unencumbered for the duration of the project.

In his testimony, Ricks firmly denied having represented to Reeve or

Morris that the property was free of all encumbrances at the time the Spur

Ranch Agreement was signed.  Ricks noted that, when read as a whole, the

contract provision in question merely represents that the property was free

of all covenants and restrictions that would prevent him from developing it

as a residential subdivision.  Ricks acknowledged that, in November, 2005,

at least two deeds of trust encumbered one of the five-acre parcels making

up Phase I.  However, Ricks contended that those mortgages did not

prevent him from moving forward with development of the property as

MEMORANDUM OF DECISION - 47

contemplated by the parties' agreement.  And while he did not own fee title to some of the subdivision property when the contract was signed, Ricks testified that he understood his obligation was to provide clear title to the lots when he conveyed them to Kastera upon his completion of the subdivision, something he certainly intended to do had Kastera performed.

After considering the testimony and evidence, and mindful that it was Kastera's legal counsel who drafted this provision, the Court is inclined to agree with Ricks that this is the limit of his obligation on this point.  *See In re Haskew*, 01.2 I.B.C.R. 62, 64 (Bankr. D. Idaho 2001) (if a contract is ambiguous, the court may construe ambiguities against the drafter).

Kastera, via a title report concerning the property received within a few days after the Spur Ranch Agreement was signed, was aware of the trust deeds encumbering the land, and that others claimed an ownership interest in portions of the property.  While its witnesses profess that this was alarming news, curiously, Kastera did not promptly demand that Ricks remove these title encumbrances, nor even bring this purported

MEMORANDUM OF DECISION - 48

concern to his attention until the parties' relationship began to unravel over a year later.

Kastera is, of course, correct in pointing out that Ricks had failed to deliver unencumbered property to Kastera by the time of the trial, and indeed, could not do so because of the on-going liens. However, its argument that Ricks has heavily saddled the property with mortgages in the amount of nearly $1 million with no reasonable plan or explanation as to how he can clear title to the property is of no moment. As the Court reads it, the Spur Ranch Agreement does not require Ricks to convey good and marketable title to the lots to Kastera until the time of delivery of lots. Since Kastera terminated the contract prior to Ricks' completion of the development, that Ricks can not presently convey good title to Kastera does not constitute a breach of the agreement.

The Court's conclusions regarding this provision of the Spur Ranch Agreement are consistent with its understanding of prevailing practices in real estate dealings. As noted in one treatise:

The general rule is that a title to be furnished by the seller

MEMORANDUM OF DECISION - 49

under an executory contract must ordinarily be a good title as
of the date when the contract requires it to be furnished.  Thus,
in the absence of fraud or misrepresentation, a purchaser
cannot, prior to the time fixed by the contract for conveyance,
complain that the seller's title is defective or encumbered.  An
encumbrance or other defect that is removable by the time set
for conveyance cannot provide a ground for rescission.

57 Am. Jur. Proof of Facts 3d. 287 § 8 (2009) (citations omitted).

The Idaho Supreme Court has consistently followed this general rule.

In *Sherwood v. Daly*, 78 P.2d 357, 359 (Idaho 1938), the court stated:  "A

vendor under a land contract is only required to have the title contracted

for at the time performance is due."  Likewise, in *Metzker v. Lowther*, 204

P.2d 1025, 1032 (Idaho 1949), the court held that the sellers "were obliged to

perform the covenant to have title free from liens, defects and

encumbrances only when performance was due."  More recently, the court

applied this rule, and noted an additional rule which provides that "the

existence of an encumbrance which may be removed or discharged by

application of the purchase money is not considered such a defect as to

render the title unmarketable and excuse the purchaser from the

performance of his contract."  *Jensen v. Bledsoe*, 593 P.2d 988, 994 (Idaho

MEMORANDUM OF DECISION - 50

1979) (quoting 77 Am.Jur.2d Vendor and Purchaser, § 192).

As explained above, the parties did not contract for a specific lot

delivery date.  As a result, Ricks cannot have breached the provision

requiring that unencumbered property be conveyed.

2.    Ricks' arguments regarding breach.

Ricks argues that his performance under the Spur Ranch Agreement

is excused because Kastera wrongfully interfered with Ricks' lender

relationships, thus hindering Ricks' efforts to obtain a construction loan.  In

addition, Ricks contends that by deciding not to complete its performance

and attempting to deem the contract rescinded, Kastera breached the Spur

Ranch Agreement.

Ricks' argument that Kastera wrongfully interfered with Ricks'

attempt to secure a construction loan for the Spur Ranch development is

not supported in the record.  Ricks testified that all he needed in order to

secure construction financing to finish the subdivision improvements was

some form of written assurance from Kastera that it complete performance

per the Spur Ranch Agreement upon completion of construction.  Ricks felt

MEMORANDUM OF DECISION - 51

Kastera was obligated to provide such assurances under a clause in the

Spur Ranch Agreement that provides "each party agrees to sign such other

documents as may be reasonably necessary to carry out the intent of this

agreement."  Ex. 100, ¶ 7.

Kastera argues that the banks that were contemplating extending

construction financing to Ricks were not merely seeking assurances that

Kastera would close the transaction upon completion, but rather were

seeking guarantees from Kastera that any construction loan extended to

Ricks would be repaid.  Kastera contends that such guarantees, in the form

of letters of credit, were not contemplated by the Spur Ranch Agreement,

and declined to give them.

In this instance, the Court agrees with Kastera, and concludes that by

declining to extend such guarantees Kastera was not in breach of the Spur

Ranch Agreement.  The parties' agreement did not require Kastera to

obtain a letter of credit to guarantee its intention to complete the

transaction with Ricks.  It was Ricks' obligation to finish the development,

not Kastera's, and given the absence of any express provision in the Spur

MEMORANDUM OF DECISION - 52

Ranch Agreement, he can not rely upon Kastera's hesitation in helping

Ricks acquire financing as a breach.

However, the consequences of the letter dated October 12, 2007 sent

by Kastera's counsel to Ricks' counsel is a different matter entirely.  In that

letter, Kastera informed Ricks that it no longer desired to continue with the

parties' relationship.  *See* Ex. 120.  Kastera demanded "a full and complete

rescission of its agreement with Tom Ricks and a complete return of the

$2,231,250 paid to him[,]" along with interest at the statutory rate of 12%.

*Id.*  Unequivocally, then, this letter represents an absolute, affirmative

repudiation by Kastera of any further intention to perform the parties'

contract.  Although Kastera believed at the time that Ricks had breached

the Spur Ranch Agreement by failing to timely deliver completed lots, for

the reasons explained above, the Court has ruled otherwise.  Therefore, the

Court concludes that this letter and Kastera's purported rescission was

unjustified and improper, and constituted a breach of the Spur Ranch

Agreement.

In summary, then, the Court finds and concludes that the Spur Ranch

MEMORANDUM OF DECISION - 53

Agreement is an enforceable contract, and that Kastera breached that

contract.  Kastera's claim against Ricks to recover the approximate $2.23

million it paid Ricks under this arrangement therefore fails.

     **C.**    **Damages resulting from Kastera's breach of the Spur Ranch
Agreement.**

    Kastera breached the Spur Ranch Agreement and, as a result, can not

recover the sums it paid to Ricks.  But can Ricks recover additional money

damages from Kastera on account of its breach?

    Ricks bears the burden of proving, with reasonable certainty, that

Kastera's breach of the Spur Ranch Agreement caused him to suffer

damages, and the amount of those damages.  *See Griffith v. Clear Lakes Trout

Co.*, 152 P.3d 604, 611 (Idaho 2007) ("The burden is upon the plaintiff to

prove not only that it was injured, but that its injury was the result of

defendant's breach; both amount and causation must be proven with

reasonable certainly.").  The reasonable certainty standard requires neither

absolute assurance nor mathematical exactitude; rather, the evidence need

only be sufficient to remove the existence of damages from the realm of

MEMORANDUM OF DECISION - 54

speculation.  *Id.* (citing *Fuller v. Wolters*, 807 P.2d 633, 640 (Idaho 1991)).

Ultimately, though, it is for the trier of fact – in this action, the Court – to fix

the amount of damages by determining the credibility of the witnesses,

resolving conflicts in the evidence, and drawing reasonable inferences from

that evidence.  *Id.* (citing *Sells v. Robinson*, 118 P.3d 99, 106 (Idaho 2005)).

It is in this aspect of the action that Ricks' claim against Kastera is

weakest.  Simply put, the evidence produced at trial by Ricks as to the

amount of the damages he suffered when Kastera pulled out of the parties'

deal was surely less than compelling.  To establish his right to an award of

money damages, Ricks relied heavily upon the testimony of Gale Pooley,

an expert, who prepared a written report, Ex. 146, and Ricks' own

testimony.  Neither source of information was persuasive.

In his report, Pooley estimated Ricks' damages resulting from

Kastera's breach of the Spur Ranch Agreement at $800,000.  As previously

indicated, Kastera challenged Pooley's competency, and also objected to

admission of the report into evidence.  However, in the Court's opinion,

Pooley was adequately qualified by education, training, and experience to

MEMORANDUM OF DECISION - 55

give expert testimony under Fed. R. Evid. 702. His reports were

admissible, in the Court's view, under Fed. R. Evid. 703. Therefore,

Kastera's objections to, and requests that the Court exclude, both the Pooley

testimony and his reports, Exs. 146 and 147,[24] are denied.

That it was proper for Pooley to testify and render an opinion,

however, does not mean that his views were adequate to prove Ricks'

alleged claim for damages. Indeed, for the reasons outlined below, while

his resume was impressive, Pooley's presentation was lacking, and the

Court ascribes almost no weight to Pooley's testimony and these exhibits.

Pooley is, apparently, an appraiser and economist. He is licensed in

Idaho as a real estate broker, and holds the MAI designation from the

Appraisal Institute. He has college degrees in accounting and economics,

and has completed substantial continuing education course work in the

field of real estate appraisal. In addition, Pooley has received a so-called

"litigation certificate" from the Appraisal Institute and has testified as an

---

[24] Ex. 147 is the appraisal report that pertains to the Other Properties
Agreement, which will be addressed later in the decision.

MEMORANDUM OF DECISION - 56

expert witness in several Idaho cases in recent years. *See generally*, Ex. 145. At trial, Pooley was fairly articulate, seemed adequately-versed in appraisal techniques, and appeared knowledgeable regarding the Spur Ranch property. However, from the Court's perspective, there were several serious deficiencies in the substance of Pooley's testimony, and his inability to support his opinions with facts renders his calculations of Ricks' damages, in the Court's opinion, quite unreliable.

Pooley's estimate of damages with respect to the Spur Ranch Agreement was comprised of two components: his loss of development profit and his loss in property value. Pooley opined that Ricks lost $385,569 in development profit as a result of Kastera's breach of the Spur Ranch Agreement, and that Ricks' loss in property value at Spur Ranch was $418,622. *See* Ex. 146. Pooley totaled and rounded these figures to arrive at his final estimation of damages resulting from the Spur Ranch Agreement. The Court declines to rely upon Pooley's analysis regarding either component of this calculation.

As for Ricks' loss in property value, Pooley explained that because

MEMORANDUM OF DECISION - 57

the residential real estate market softened markedly after the Ricks-Kastera

Spur Ranch deal was made, the Spur Ranch property significantly

decreased in value.  According to Pooley, because he lost his "sale" of the

development, Ricks should be able to recoup the decline in the value of the

property from Kastera as breach damages.  To support this theory, Pooley

identified a July 3, 2009 appraisal which valued the property as of that date

at $795,000.[25]  Since Ricks acquired the property for $1,213,622, Pooley

opined that the difference which Ricks should be entitled to is $418,622.

The Court disagrees with Pooley's approach on this point.  Indeed, if

Ricks were to recover both the loss in property value, and any alleged

development profits, Ricks would benefit from a clear "double-dip" on

damages.  Under these facts, in the Court's opinion, to fully compensate

Ricks for the benefit of his bargain under the Spur Ranch Agreement in this

case, the Court need only look to the first component of Pooley's

---

[25] This appraisal report was apparently completed by another appraiser.
Pooley obtained a copy of the appraisal and reviewed it in connection with
preparing his testimony and report in this case.  However, the underlying
appraisal was never introduced into evidence.

MEMORANDUM OF DECISION - 58

calculation – Ricks' loss of the profits he would have enjoyed as a result of

his development of the property and its sale to Kastera.

To prove that Ricks lost profits on the Spur Ranch deal, Pooley

would have to present a detailed analysis of Ricks' cost to acquire the

property, together with the development costs, as compared to what

Kastera agreed to pay Ricks under the Spur Ranch Agreement.  Pooley's

presentation concerning Ricks' lost development profits was lacking,

however.  Of principal concern to the Court in attempting to determine if

Ricks had lost development profits was the conspicuous absence in the

record of any of the critical data supporting Pooley's fundamental

assumptions upon which his calculations were founded.  Pooley testified

that in making his assumptions, he reviewed on-line data in the real estate

multiple listing service ("MLS") to identify comparable developments and

properties.  Without showing the parties or the Court any of the data from

which he worked, he then manipulated and allegedly extrapolated

information from these resources based upon his own experience in the

market to formulate what he felt were reasonable assumptions for

MEMORANDUM OF DECISION - 59

development costs for a residential property.[26]  Armed with those

assumptions, and after deducting the amount of Kastera's initial payment

to Ricks, Pooley opined that Ricks lost $385,569 in potential profits when

Kastera declined to follow through with its contract to buy the developed

Spur Ranch property from Ricks.

     While it was not improper for an expert to consult research and sales

data, the information Pooley apparently referred to in the MLS databases

that he so heavily relied upon was not included in his report, nor was it

otherwise offered into evidence, although Pooley contended that the

information was still available and could be viewed by anyone with access

to the MLS databases.  But the Court, as the fact finder, should not be asked

to, and indeed can not properly, do its own research regarding the

substance or reliability of the facts upon which an expert witness has based

his opinions.  Pooley's summary approach to documenting the basis of his

------------------------------------------------

[26] In Ex. 146, Pooley projected that the total development costs for the
completed 44 lots in Spur Ranch which Kastera was to purchase would have
been $1,970,733.  Other than by simply trusting Pooley's opinion, the Court can
not determine how the witness arrived at this figure.

MEMORANDUM OF DECISION - 60

opinions did not allow Kastera or the Court to truly test the reliability of his

opinions.  When pressed about the lack of supporting data by the Court,

Pooley explained that, because he was asked to prepare only a limited, or

summary report, the applicable standards of professional appraisal practice

did not require him to attach all of the supporting information for his

assumptions to the report.  While that explanation may render Pooley's

opinion and report adequate under professional standards, the deficiencies

inherent in that method of presenting courtroom evidence are significant,

and as a result, the willingness of the Court to accept Pooley's figures is

adversely impacted.  Although the Court has no reason to doubt that

Pooley consulted some information in the MLS databases and other

resources, it must speculate as to the quality, quantity and relevancy of that

information.  The Court is unwilling to engage in such speculation. Ricks

bears the burden of proof on damages, and without this crucial

information, the Court has no way to gauge the reliability and

reasonableness of Pooley's assumptions regarding development costs.

In an attempt to shore up Pooley's numbers, Ricks, who admittedly

MEMORANDUM OF DECISION - 61

has considerable practical experience in real estate development, testified
that he felt the assumptions Pooley used were reasonable ones.  But
without knowing more about the data underpinning Pooley's assumptions,
the Court remains unwilling to accept his conclusions, or Ricks'
endorsement of them.  Without the data, Ricks' opinion is itself, at best,
untestable, and at worst, self-serving speculation.

For these reasons, the Court concludes that Ricks has not carried his
burden of proving that he suffered quantifiable money damages as a result
of Kastera's breach of the Spur Ranch Agreement.  Pooley's reliance on the
decline in value of the Spur Ranch property is not appropriate to show
damages in this context.  Moreover, Pooley's calculations of Ricks' lost
profits on this project, without proof of the facts upon which he relied to
arrive at his conclusions, renders his opinions unreliable speculation,
outside the realm of reasonable certainty.  On this record, the Court is
unable to award money damages to Ricks based upon Kastera's breach of

MEMORANDUM OF DECISION - 62

the Spur Ranch Agreement.[27]

### D.    The Other Properties Agreement.

1.    <u>The Nature of the Agreement</u>.

Much like it did with respect to the Spur Ranch Agreement, Kastera challenges Ricks' ability to recover under the Other Properties Agreement by arguing that the contract is legally unenforceable. To do so, Kastera characterizes the compensation Ricks was to receive under this contract as a commission on the purchase of real property. Because Ricks is not a licensed real estate agent or broker, Kastera contends that the Court may not enforce this "commission agreement" under Idaho law. Once again, the Court declines to adopt Kastera's spin on the nature of the Other Properties Agreement.

Under this arrangement, it is true that the parties contemplated that

---

[27] In his complaint, in addition to seeking an award of money damages, Ricks alleged in the alternative that he is entitled to specific performance of the Spur Ranch Agreement and the Other Properties Agreement. However, at trial and in his post-trial submissions, Ricks focused exclusively on money damages as a remedy for Kastera's breaches. As a result, the Court concludes that Ricks has effectively abandoned his claim to specific performance concerning these agreements.

MEMORANDUM OF DECISION - 63

Ricks, calling upon his prior good relations with them, would approach

land owners with potential development property in the Eagle area, and

then attempt to persuade them to sell their land to Kastera.  In this limited

sense, Ricks was indeed serving in a role similar to that of a buyer's realtor.

However, the Other Properties Agreement was much broader.  After

Kastera successfully acquired land from one of the owners targeted by the

Other Properties Agreement, Ricks was given the duty (or right, depending

upon perspective) to supervise the development of the property into home

sites so that Kastera would have a location for the houses it would build.

To compensate Ricks for his development efforts, Kastera agreed to pay

Ricks a percentage of the profits from these ventures.

In the Court's view, the Other Properties Agreement envisioned

something akin to a joint venture.  Kastera was not interested merely in

retaining Ricks to find land to acquire.  Ricks, in turn, sought more than a

"finder's fee" and wanted an opportunity to use his skill, and Kastera's

capital, to develop property for home sales.  Ricks' compensation is not

analogous to a commission on the sale of the property; instead, his

MEMORANDUM OF DECISION - 64

compensation, in the form of a share of profits, was intended to reward him

for his efforts in locating land and completing a successful development.

When the parties' goals are seen in this fashion, Kastera's attempt to focus

the Court on Idaho real estate licensing law completely misses the mark.

Nonetheless, the Court has considered the licensing statutes which

Kastera now insists should invalidate the agreement.  Specifically, Kastera

directs the Court to Idaho Code §§ 54-2002 and 54-2065.  The former

provides, in pertinent part:

> No person shall engage in the business or act in the capacity of
> real estate broker or real estate salesperson in this state without
> an active Idaho real estate license therefore.  Unless exempted
> from this chapter, any single act described within the
> definitions of "real estate broker" or "real estate salesperson"
> shall be sufficient to constitute "engaging in the business"
> within the meaning of this chapter.

Idaho Code § 54-2002.  The other statute provides that any person acting as

a real estate broker or salesperson, within the meaning of the Idaho real

estate license laws and without the appropriate licenses, may be subject to

civil and criminal penalties, including fines and imprisonment in the

discretion of the court.  Idaho Code § 54-2065.  Kastera argues that together,

MEMORANDUM OF DECISION - 65

these provisions effectively thwart Ricks' attempt to recover anything from Kastera under the Other Properties Agreement.

In its haste to now find fault with Ricks' actions and with the Other Properties Agreement, Kastera overlooks a key element of the statutes – the exceptions to licensure. Idaho Code § 54-2003(1)(b) provides that "an Idaho real estate license is not required for . . . [the] acquisition, exchange or other disposition of any interest in real property or business opportunity by its owner or a regular employee of the owner, acting within the scope of his or her employment[.]". Although Ricks may not have been a Kastera employee in the traditional sense, he was undoubtedly affiliated with Kastera with respect to these ventures, and his actions were certainly within the scope of the parties' business arrangement. Since they were acting in concert under a joint venture, no license was required for Ricks to link prospective sellers with Kastera.

However, even if this exception does not apply under these facts, Kastera has not shown how the licensure statutes would invalidate the Other Properties Agreement. Like the statutes and city ordinances

MEMORANDUM OF DECISION - 66

analyzed earlier with respect to the Spur Ranch Agreement, these licensing

statutes provide penalties for acting in the capacity of a broker or

salesperson without a license; but, the statues fail to evidence an intent on

the part of the state legislature to void contracts which may be in

contravention of their terms.  *See Farrell v. Whiteman*, 200 P.3d 1153, 1158

(Idaho 2009) (Holding that since "the consequences of a court finding a

contract to be illegal are harsh, only those contracts which involve

consideration that is *expressly* prohibited by the relevant prohibitory statute

are void.").  Thus, consistent with the conclusions reached by the Court

above regarding the Spur Ranch Agreement, the Court also declines to

conclude that the Other Properties Agreement is unenforceable due to an

apparent conflict with Idaho real estate licensure laws.  *Compare Cox*, 639

P.2d at 20 (concluding that the parties' contract should not be invalided for

failure to comply with Idaho Code § 50-1316).

       In the absence of some other legal defense, the Court concludes that

the Other Properties Agreement is valid and enforceable, and focuses its

attention on whether it was breached.

MEMORANDUM OF DECISION - 67

2.      The Other Properties Agreement was Breached by
        Kastera.

Ricks argues that Kastera breached the Other Properties Agreement
by rescinding it, thereby usurping Ricks' opportunity to develop the
properties acquired by Kastera that were subject to the agreement.

Ricks argues that the October 12, 2007 letter sent by Kastera's counsel
to Ricks' counsel purported to cancel not only the Spur Ranch Agreement,
but all agreements contemplated by the parties, including the Other
Properties Agreement.  While that letter, like the other documents in this
case, is not the model of clarity, the Court agrees with Ricks that it was
intended to put an end to all of the agreements made between the parties.
Although the bulk of the letter describes the circumstances surrounding the
Spur Ranch development, the final few paragraphs reference the cash
advances which Kastera had been making to Ricks and his son.  These
monthly advances were not made under the Spur Ranch Agreement, but
rather were paid to Ricks and his son pursuant to the specific terms of the
Other Properties Agreement.  In the final paragraph of the rescission letter,

MEMORANDUM OF DECISION - 68

Kastera's lawyer indicates that these advances will be discontinued. Moreover, the general tone of the letter clearly evidences Kastera's intent to sever all ties with Ricks. For these reasons, the Court finds that by sending the letter to Ricks' counsel, Kastera effectively terminated the parties' relationship and thereby breached the Other Properties Agreement.

Even if the Court is incorrect with respect to the meaning of the Kastera letter, the evidence shows that, in fact, Kastera did not permit Ricks to develop the property it acquired under, and as contemplated by, the Other Properties Agreement. The agreement explicitly provided that Ricks would be in charge of developing all properties Kastera acquired subject to the agreement, either under his own name, or under a company name, for Kastera. *See* Ex. 129. However, the evidence showed that over time, after the parties inked the Other Properties Agreement, Kastera began to venture into land development on it own in addition to house construction, and many of the development responsibilities were delegated to Kastera's internal staff under the supervision of Wayne Forrey, rather than to Ricks. By depriving Ricks of the opportunity to develop the property, Kastera

MEMORANDUM OF DECISION - 69

breached the Other Properties Agreement.

       3.     <u>Proof of Damages</u>.

Again, for Ricks, the difficult aspect of his claim for breach of the

Other Properties Agreement concerns proof of those damages he may have

suffered.  In his closing argument, Ricks elected not to pursue his damage

claims previously asserted against Kastera with respect to the Thornton

and Gabica properties, for $1,430,000 and $250,000, respectively.  However,

Ricks maintains his claim against Kastera for damages relating to the Purdy

and Cleaver properties, in the amounts of $2,800,000 and $1,100,000,

respectively.  *See* Ricks' Closing Argument, Docket No. 58.  To support

these claims, Ricks relies heavily on the appraisal report prepared by

Pooley, Ex. 147.

By tying his fortunes to Pooley's report, Ricks' proof suffers from the

same deficiencies discussed above in relation to the Spur Ranch property.

In particular, and again, Pooley has produced none of the data from the

MLS databases upon which he relied in reaching his conclusions.  Without

this information the Court cannot properly determine whether Pooley's

MEMORANDUM OF DECISION - 70

many, critical assumptions regarding development costs and future sales prices were reasonable.  For this reason, the Court concludes that Ricks has not proven with reasonable certainty what losses he suffered as a result of Kastera's breach of the Other Properties Agreement.  Accordingly, no damages are awarded to Ricks for Kastera's breach of the Other Properties Agreement.[28]

###       E.       Kastera's Unjust Enrichment Claim.

In the alternative to its breach claim, Kastera alleges that Ricks has been unjustly enriched by his retention of over $2.23 million which Kastera paid to him.  Kastera contends that, under the circumstances, it would be inequitable for Ricks to have the benefit of that money.  Kastera's argument lacks merit.

---

[28]  In his complaint, in addition to damages, Ricks also sought an accounting from Kastera for the parties' alleged joint venture, and recovery of unspecified lost "business opportunities" which Kastera allegedly usurped from Ricks.  However, like his claim for specific performance of the agreements, Ricks' evidence and post-trial arguments do not mention his need for an accounting, and instead focused exclusively on recovering money damages as Ricks' sole remedy for Kastera's actions.  As such, the Court concludes that Ricks has abandoned his claim for an accounting from Kastera.

MEMORANDUM OF DECISION - 71

"Unjust enrichment occurs where a defendant receives a benefit which would be inequitable to retain without compensating the plaintiff to the extent that retention is unjust." *Vanderford Co. v. Knudson*, 165 P.3d 261, 271 (Idaho 2007) (citing *Beco Constr. Co. v. Bannock Paving Co.*, 797 P.2d 863, 866 (Idaho 1990)).  However, the doctrine is not available where there is an enforceable contract between the parties which covers the same subject matter.  *Id.* at 272 (citing *Wilhelm v. Johnston*, 30 P.3d 300, 307 (Idaho Ct. App. 2001)).  "Equity does not intervene when an express contract prescribes the right to compensation." *Id.* (citing *Shacocass, Inc. v. Arrington Constr. Co.*, 776 P.2d 469, 473 (Idaho Ct. App. 1989)).

In this case, Kastera paid Ricks as an advance of sums due to him under the Spur Ranch Agreement.  While Kastera disagrees, the Court has previously concluded that the Spur Ranch Agreement was valid and enforceable.  The mere existence of this contract bars Kastera's equitable claim for unjust enrichment.  *See Vanderford*, 165 P.3d at 272.

But, of course, in order to recover for unjust enrichment, Kastera must prove it would be inequitable for Ricks to retain the funds it paid to

MEMORANDUM OF DECISION - 72

him.  Kastera has done no such thing.  As explained above, it was Kastera, and not Ricks, that breached the parties' agreements and, arguably, engaged in the improper conduct.  In contrast, although his performance had been significantly delayed by the circumstances, Ricks had performed his obligations through the time that Kastera rescinded the agreement. Although Ricks failed to prove with the requisite certainty the amount of his damages to support an award by the Court, the fact remains that he was likely prejudiced by Kastera's breaches.

Simply stated, the equities do not favor Kastera, and it has shown no basis for any unjust enrichment claim against Ricks.

### F.    Rick's Objection to Kastera's Proof of Claim.

Kastera filed its proof of claim in Ricks' bankruptcy case alleging it was owed over $3,000,000 on account of Ricks' breaches of the parties' contracts.  In his complaint, Ricks objected to the proof of claim, contending that he owed no debt to Kastera.  Having previously concluded that Ricks did not breach the parties' contracts, while Kastera did break its promise to Ricks, the Court concludes that Ricks is correct, and no debt is owed by

MEMORANDUM OF DECISION - 73

Ricks to Kastera.  Because Kastera's claims against Ricks are not valid

under applicable state law, its proof of claim can not be allowed in the

bankruptcy case.  *See* § 502(b)(1) (providing that a claim should be

disallowed if it is unenforceable against the debtor under applicable law).

Therefore, Ricks' objection to Kastera's proof of claim should be sustained,

and the claim disallowed for purposes of any distributions in Ricks'

bankruptcy case.

## IV.

## Conclusion

As explained above, the Court concludes that both the Spur Ranch

Agreement and the Other Properties Agreement are valid and enforceable

contracts.  Through its actions, Kastera breached both agreements.

However, owing to a lack of adequate proof, Ricks has not shown with

reasonable certainty the amount of his damages resulting from those

breaches, and therefore no damages are awarded by the Court.

Kastera's counterclaims against Ricks for various contractual

breaches and unjust enrichment lack merit and will be dismissed.

MEMORANDUM OF DECISION - 74

Ricks owes no debt to Kastera as a result of these transactions.

Therefore, Kastera's proof of claim which was filed in Ricks' bankruptcy

case will be disallowed.

A separate judgment will be entered.

Dated:  July 27, 2010

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 75